BREY, Respondent, vs. FORRESTAL and another, Appellants: SELLERS, Administratrix, Respondent, vs. FORRESTAL and another, Appellants.

*November 1—November 19, 1912.*

*Master and servant: Injury from boiler explosion: Pleading: Variance: Special verdict: Instructions to jury: Submission of ground of negligence not pleaded: Waiver of objection to evidence: Cross-examination: Appeal: Errors, when cured: Prejudicial errors.*

1. In an action for injuries sustained by an employee through the explosion of a steam boiler, no defect in the design or construction of the boiler was alleged, but in connection with this question of the special verdict, "Was the boiler in question negligently kept by defendants in a dangerous and unsafe condition?" the court charged the jury in effect that they should an-

swer in the affirmative if satisfied from the evidence that the boiler was so kept either by reason of the construction and maintenance of the fire flue therein or by reason of a globe valve thereon being closed. *Held* error, because under such charge the jury might have found defendant negligent solely upon the ground of improper construction of the fire flue—a matter not within the issues.

2. Such error was not cured by the jury's finding, as a separate ground of negligence, failure to warn plaintiff of the likelihood of the boiler exploding by reason of its dangerous condition, since such finding relates back to and is inseparably connected with the question of defective construction of the fire flue. TIMLIN, J., dissents.

3. Where a complaint for injuries resulting from the explosion of a steam boiler charges certain specific defects in the boiler, but not defective construction of the fire flue, the admission of evidence, against objection and without amendment of the complaint, of such defect in the fire flue and submission of the same to the jury was error, unless the objection was afterwards withdrawn or waived.

4. Where plaintiff, after a ruling by the court excluding evidence of such unpleaded defect, introduced expert testimony as to the construction of the fire flue and its collapse inward, expressly for the purpose of showing why the witness reached the conclusion that the explosion was due to excessive steam pressure, defendants had the right to rest upon the assurance that such testimony was offered and received for the sole purpose stated, and to cross-examine fully thereon without opening the door to testimony upon the general subject of the safe construction of such flue.

5. Erroneous admission of evidence of an unpleaded defect against defendants' objection, and submission of the same to the jury, must be deemed to have affected a substantial right of defendants, namely, the right to know what charge of negligence is made against them in time to prepare their defense, and is therefore ground for reversal.

APPEALS from judgments of the circuit court for Milwaukee county: F. C. ESCHWEILER, Circuit Judge. *Reversed.*

These are two actions in tort which were tried together before the same jury and on the same evidence. The defendants owned and operated, by means of employees, a dredging outfit for the digging of drainage ditches through swamp

lands.    The outfit consisted of a scow, seventy-five feet long and eighteen feet wide, on the rear end of which was placed a boiler and near the front end an engine, together with drums controlled by levers which operated the dipper.    The ditch was made by the dipper at the front as the scow proceeded forward, the same being floated in the ditch thus made; and the work continued night and day.    The work required two shifts of three men each: an engineer or "runner," so called because he ran the drums and the dipper by the pulling of levers; a fireman; and a roustabout.    On one shift one Kane was the engineer, and on the other shift Sellers (the plaintiff *Emma Sellers's* intestate) was engineer and the plaintiff *Brey* was fireman.  .

On the morning of May 29, 1909, at about 5 o'clock, while Sellers's shift was operating the dredge near Dancy, Wisconsin, the boiler exploded without warning, killing Sellers and seriously injuring *Brey,* and these actions are the result of that explosion.

The charges of negligence in the complaint in the *Brey Case* are as follows:

"Second.    That on said day and for some time prior thereto, plaintiff alleges on information and belief the defendants had carelessly, recklessly and negligently, suffered, permitted and caused the said boiler, the steam gauge and safety valves attached thereto to become and be out of repair, worn, weakened, dangerous and unfit for use; that said defendants carelessly and negligently permitted and caused water taken from said ditch, which water was filled with sediment and dirt, to be taken into and used in said boiler, thereby causing parts of said boiler to burn, bake and foam and otherwise rendering its use and that of the steam gauge unreliable and dangerous; that on said day and prior thereto, said defendants had and did carelessly and negligently suffer, permit and cause the safety valve upon said boiler, a device used to automatically permit of the discharge of steam, thereby relieving the strain or pressure upon the boiler before the same became dangerous,

to become and be defective, plugged up, out of repair and useless, thereby and by reason of the weakened and defective condition of said boiler and the causes aforesaid, defendants carelessly and negligently caused, suffered and permitted the place upon said scow or dredge boat and in the vicinity of said steam engine and boiler to become and be unsafe and extremely hazardous and dangerous to this plaintiff and other servants of the defendants there employed; that owing to the said defective, weakened and dangerous condition of said boiler and the failure of said safety valve and steam gauge to properly work, owing to their plugged and defective condition as aforesaid, the said boiler on said day, when subjected to strain and pressure in an attempt to generate the steam necessary to operate said dredge, exploded with great force and violence, thereby killing one person and injuring others of the defendant's servants there employed, and among them this plaintiff was then and there seriously and permanently injured as hereinafter more fully appears."

"That plaintiff, to the knowledge of defendants, was wholly inexperienced in and about the proper care, control and operation of steam engines and boilers and was wholly unaware of the danger and likelihood of said boiler exploding because of its said defective condition and uses, and the defective condition of said steam gauge and safety valve, and was wholly unaware of the said engineer's incompetency, lack of experience, knowledge and capacity necessary to safely and properly discharge the said duties of an engineer; that though plaintiff was thus ignorant and uninformed and wholly ignorant of the danger to which plaintiff's service for defendants subjected plaintiff, defendants negligently and carelessly set plaintiff to work in said dangerous place and at said dangerous work upon said scow or dredge boat, and near to said steam engine and boiler, without giving plaintiff any warning, caution or information concerning same, or of the great risk and peril to which plaintiff was thereby subjected; that while thus employed and while ignorant of said danger and peril and of said dangerous conditions, on said day, and without fault or negligence on his part, but solely through the fault and negligence of said defendants, the said boiler exploded

with great force and violence, thereby seriously and permanently injuring plaintiff more specifically as hereinafter stated."

In the *Sellers Case* the charges of negligence were substantially the same as in the *Brey Case*, except that it was not alleged that Sellers was inexperienced in the operation of steam engines and boilers.

In the *Brey Case* the following special verdict was returned:

"(1) Was the boiler in question negligently kept by defendants in a dangerous and unsafe condition at and prior to the time of the accident?　*A.* Yes.

"(2) If you answer No. 1 'Yes,' then answer: Did the defendants know of such dangerous and unsafe condition prior to the accident?　*A.* Yes.

"(3) If you answer No. 1 'Yes' and No. 2 'No,' then answer this question: Ought the defendants in the exercise of ordinary care to have known of such condition?　*A.* ——.

"(4) If you answer question No. 1 'Yes,' then was such dangerous and unsafe condition of the boiler a proximate cause of plaintiff's injuries?　*A.* Yes.

"(5) Was the use of the closed globe valve a proximate cause of the boiler explosion?　*A.* Yes.

"(6) If you answer question No. 1 'Yes,' then did defendants instruct or warn the plaintiff of such condition?　*A.* No.

"(7) If you answer No. 1 'Yes' and No. 6 'No,' then answer this: Ought plaintiff in the exercise of ordinary care to have known of such dangerous and unsafe condition?　*A.* No.

"(8) If you answer No. 6 'No,' then answer this: Were the defendants guilty of a want of ordinary care in failing to inform the plaintiff prior to his injuries of the likelihood of the boiler exploding?　*A.* Yes.

"(9) Ought the plaintiff in the exercise of ordinary care to have appreciated the likelihood of the boiler exploding? *A.* No.

"(10) If you answer question No. 6 'No,' then answer this: Was such failure to inform the plaintiff of the likeli-

hood of the boiler exploding a proximate cause of plaintiff's injuries? *A.* Yes.

"(11) Was plaintiff guilty of a want of ordinary care which proximately contributed to his injuries? *A.* No.

"(12) At what sum do you assess plaintiff's damages? *A.* $7,000."

In the *Sellers Case* the following special verdict was returned:

"(1) Was the boiler in question unsafe and dangerous at and prior to the accident, owing to any improper design or construction of the fire flue? *A.* Yes.

"(2) If you answer question 1 'Yes,' then answer: Did the defendants know prior to the accident of such unsafe and dangerous design and construction of the fire flue? *A.* No.

"(3) If you answer No. 1 'Yes' and No. 2 'No,' then answer: Ought the defendants in the exercise of ordinary care to have known of such unsafe and dangerous design and construction of the fire flue? *A.* Yes.

"(4) Was the boiler unsafe and dangerous prior to the accident owing to the use of the closed globe valve under the pop valve? *A.* Yes.

"(5) If you answer No. 4 'Yes,' then did defendants know prior to the accident of such unsafe and dangerous use of the closed globe valve? *A.* Yes.

"(6) If you answer 4 'Yes' and 5 'No,' then answer: Ought the defendants in the exercise of ordinary care to have known of such unsafe and dangerous use of said closed globe valve? *A.* ——.

"(7) If you answer question 1 and 4 or either of them 'Yes,' then answer this: Were the defendants guilty of negligence in the use of such unsafe and dangerous boiler? *A.* Yes.

"(8) If you should answer the seventh question 'Yes,' then was such negligence the proximate cause of the injury and death of Sellers? *A.* Yes.

"(9) If you answer either or both 1 and 4 'Yes,' then answer: Ought the deceased, Joseph Sellers, in the exercise of ordinary care to have known of such danger? *A.* No.

"(10) Was the deceased, Joseph Sellers, guilty of a want

of ordinary care which proximately contributed to his injuries? *A.* No.

"(11) At what sum do you assess plaintiff's damages? *A.* $2,500."

Judgment for the plaintiff was rendered in each case, and the defendants appeal.

For the appellants there was a brief by *John J. Maher,* attorney, and *Thomas H. Gill,* of counsel, and oral argument by *Mr. Gill.*

*D. D. Conway,* attorney, and *P. H. Martin,* of counsel, for the respondents, contended, *inter alia,* that defendants, not having objected to the issues submitted nor assigned error thereon, could not now raise the objection. *Howard v. Beldenville L. Co.* 134 Wis. 644, 114 N. W. 1114; *Sloteman v. Thomas & W. Mfg. Co.* 69 Wis. 499, 34 N. W. 225; *Duffy v. Radke,* 138 Wis. 38, 41, 119 N. W. 811.

WINSLOW, C. J.    The most serious and important claim made by the appellants in these cases is that, without amendment of the complaints and against the defendants' specific objection, the plaintiffs were allowed to prove and the jury to find that the boiler was defective in the design and construction of its fire flue, whereas the defects charged in the complaints were defects and weaknesses resulting from wear and tear, improper use, and improper plugging of the safety valve.

It is very certain that this issue was litigated and passed upon by the jury in the *Sellers Case.*   The first question of the special verdict in that case submits this precise issue, and the jury answered it in the plaintiff's favor; also by their answers to questions 7 and 8 in that case they found the use of the boiler with such defective design and construction to be negligence which was the proximate cause of Sellers's death.

In the *Brey Case* there is no direct question submitted to the jury as to defective design or construction, but it seems

certain that by the first question of the verdict, taken in con-
nection with the charge of the court, the jury necessarily
passed upon it.    That question, as will be seen by reference
to the statement of facts, was as follows: "Was the boiler in
question negligently kept by defendants in a dangerous and
unsafe condition at and prior to the time of the accident ?"

The instruction with reference to this question was in part
as follows:

"As to this question, you are instructed that if you are all
satisfied to a reasonable certainty by a fair preponderance of
the evidence that by reason *of the construction and main-
tenance* of the fire flue in that boiler, the defendants negli-
gently kept the boiler in a dangerous and unsafe condition;
or if you are all satisfied to a reasonable certainty by a fair
preponderance of the evidence that by reason of the keeping
of the globe valve, of which you have heard, in a closed con-
dition prior to the accident, the defendants thereby negli-
gently kept that boiler in a dangerous and unsafe condition,
then and in either event you will answer this question 'Yes,'
otherwise you must answer it 'No.'"

By this question the attention of the jury was specifically
called to the inquiry whether the boiler was unsafe and dan-
gerous by reason of "construction and maintenance of the fire
flue," and they were in substance told that if it was the de-
fendants were guilty of negligence.    It seems that a jury-
man who believed that the fire flue was improperly con-
structed or designed was obliged to answer this question in
the affirmative under the instructions, whatever might be his
conclusion with reference to the condition of the globe valve.
We conclude, therefore, notwithstanding the difference in the
form of the questions, that the question of a defect in the de-
sign and construction of the fire flue was submitted to and
passed upon by the jury in both cases, and forms one of the
grounds of actionable negligence upon which the conclusion
of legal liability is based.

It is true that in the *Brey Case* the jury found as a separate

ground of negligence failure to warn the plaintiff of the like-
lihood of the boiler exploding by reason of its dangerous con-
dition; but here again it seems inevitable that, if a juryman
concluded that the boiler was unsafe by reason of the de-
fective construction of the fire flue which the defendants
ought to have known, that juryman must further have con-
cluded that the failure to warn of this danger was the negli-
gent failure to warn upon which liability rests in the *Brey
Case,* and thus the question of the defective construction of
the fire flue forms an inseparable part of the ground upon
which liability is based under both verdicts. We therefore
proceed to the question whether this question was properly in
the case.

It is very clear to our minds from a mere inspection of the
complaints that they do not charge any defect in the original
design or construction of the boiler. We might consume con-
siderable space perhaps in discussing this subject, but we
should gain nothing thereby. If it appears to any mind that
under any ordinary rule of construction such a defect is
charged in the complaints we should not expect to be able to
convince that mind to the contrary. This conclusion logic-
ally brings us to the question whether by reason of anything
occurring on the trial of the case the question whether such
a defect existed has become a proper subject of investigation
and determination in the cases.

It seems that this could only be by reason of an amend-
ment to the complaint made during the trial or at its close, or
by reason of the fact that evidence bearing on the question
was introduced without objection and thus the issue was liti-
gated by consent of the parties without formal amendment of
the pleadings. It is not claimed that there was any amend-
ment of the complaints here, but that the defendants first in-
troduced evidence affirmatively bearing on the question of de-
sign and construction, and thus opened the door and con-
sented that the issue should be litigated.

In order to understand the basis of this claim it will be necessary to state some additional facts as well as some details of the trial.

The dredging outfit was purchased by the defendants from a steam shovel company in the early part of the year 1907 and had been in use two seasons and up to May 29, 1909. The boiler was horizontal, round, about ten feet in length and fifty-four inches in diameter, having a round fire flue, which served as the furnace, twenty-nine inches in diameter, extending from the front of the boiler about eight feet to the rear, and terminating in a combustion chamber which was separated from the rear end sheet of the boiler by a space of four or five inches, the combustion chamber being considerably larger than the fire flue. Fifty-four fire tubes or flues, two and one-half inches in diameter, extended from the combustion chamber above and at the side of the fire flue or furnace forward to the front of the boiler, thus bringing the smoke back to the smokestack. The fire flue and combustion chamber were completely surrounded by water when the boiler was properly operated. About midway in the length of the boiler was the steam dome, and out of it projected a two and one-half inch steam pipe carrying steam to the engine, also a one and one-half inch safety valve pipe extending through the roof, and intended to be furnished with the ordinary pop valve for safety purposes. There was a water glass and a steam gauge, and the pressure ordinarily carried was from 100 to 115 pounds. If the pressure went below ninety-five pounds the dredge would not operate as well as it should. For some reason—probably owing to the vibration of the scow—the pop valve or safety valve on the end of the last-named pipe was apt to become loose, and three or four such valves had been blown off by the pressure and became lost in the marsh, allowing all the steam to escape from the boiler and necessitating in each case a shut-down of several hours in order to get up steam pressure again. There is testimony

that Sellers inserted a plug in the pipe after one of the pop valves blew off, thus closing it entirely. The last pop valve put on was arranged to go off at ninety-five pounds pressure, and at or before the time it was put on a globe valve was put on just below it, with the apparent idea that if the pop valve blew off the globe valve could be at once turned and thus prevent the boiler from being emptied of steam. It seems that Sellers or Kane put on the globe valve, but there is a dispute as to which did it. There is no doubt, however, that both knew of it. Either of them had authority to purchase such incidental repairs as were necessary and place them in position. For some days before the explosion the globe valve had been closed, and it was found closed after the explosion. *Brey* testified that he did not know the globe valve was there or that it was closed. He also testified that on the morning of the explosion he had raised the steam pressure to about ninety-five pounds, that he had a good fire on, and he proceeded to oil the machinery for about five or ten minutes, when the explosion took place. No one knows the pressure at the time of the explosion. The boiler was shot out of the scow by the force of the explosion and landed in the marsh some 500 feet distant.

The plaintiffs claimed that the explosion was caused by pressure of steam which the boiler in its weakened condition, with a closed escape valve, could not stand, while the defendants' theory was that the explosion resulted because the water was allowed to become too low in the boiler by the fireman, *Brey*. The plaintiffs placed upon the witness stand two witnesses, Mr. Henry J. Mistle and Prof. Mortimer Cooley, to give expert testimony as to the cause of the explosion after examination of the boiler. Both witnesses, after qualifying themselves to testify as expert engineers, testified that in their judgment the explosion was caused by excess of steam pressure, and that there was no evidence that it was caused by low water. Both witnesses based their conclusion principally

upon the fact that the fire flue collapsed inward, indicating that the flue was compressed by the pressure of steam in the boiler around it. In the course of Mr. Mistle's direct examination he was asked: "You may state what the fact is with reference to the strength of this type of fire flue as compared with the ones now in general use," and replied: "They are not fit for the high pressure they are carrying." At this point the defendants' counsel objected to the question on the ground that there was no issue in the pleadings as to the original construction of the boiler. Upon this objection argument was heard, and in course of the argument defendants' counsel moved to strike out the answer which had been made. The court ruled with the defendants, and thereupon the plaintiffs moved for leave to amend the complaints so as to charge that the boiler was defective in type. On this motion being made, the defendants claimed that they were not ready to meet such an issue, and that the cases would have to go over the term if the amendment were made. This statement was apparently received by court and counsel as sufficient without affidavit, and thereupon plaintiffs' counsel concluded that there was sufficient in the pleadings as they stood and he would not press the motion to amend. Mr. Mistle had stated without objection, just before the question above referred to was put, that the boiler was of an obsolete type, and the defendants' attorney now moved to strike out all testimony as to the original condition or the type of the boiler, which motion was granted. These rulings we regard as strictly correct, and if the matter had stopped here the question before us never would have arisen. On Mr. Cooley's examination, however, the situation changed somewhat. He stated his conclusion that the cause of the explosion was excess of pressure and not low water, and was then asked to point out to the jury what there was about the boiler which tended to support his conclusion, he being allowed to use some rough sketches which he had made to make the answers more clear. On objection be-

ing made to this form of examination because of the ease
with which incompetent testimony might come in without op-
portunity for making objection, plaintiffs' counsel said that
the idea was to point out why the witness concluded that the
explosion was due to high pressure and not to low water, and
the court overruled the objection, saying that the witness was
subject to interruption at any time if improper testimony ap-
peared.   The witness then proceeded without questions to
explain the construction of the boiler at length, the character
of the joints, the nature of the fractures made by the explo-
sion, and generally all facts which he observed about the
boiler and which he thought tended to support the conclusion
that pressure of steam on the fire flue caused the explosion.
In the course of his testimony the witness was asked whether
there were any rings or other devices to reinforce the fire flue
and replied in the negative, and further said that the flue was
made of a single sheet.   He had previously testified that the
fire flue was constructed with lap joints, which have but
seven tenths of the strength of butt joints, and all of these
facts were apparently considered by the witness as facts tend-
ing to support his expert opinion that the explosion was the
result of pressure of steam.   Probably this testimony was ad-
missible for the purpose for which it was offered, but because
admissible for that purpose it cannot necessarily be considered
as admissible for the purpose of proving an independent
ground of liability not set forth in the pleadings, especially
after the court had definitely ruled on that subject and the
offer of the testimony was accompanied by the express state-
ment that it was intended for the purpose of showing why the
witness reached the conclusion that the explosion was due to
steam pressure.   We think that defendants' counsel was en-
titled to rest upon the assurance that the testimony was of-
fered and received for the one purpose stated, and not for the
purpose of injecting into the case a new ground of liability to
which he had so recently successfully objected.   The testi-

mony being properly received, the defendants certainly had full right to cross-examine on all matters gone into by the plaintiffs without forfeiting their right to have the action confined to the cause of action pleaded.   It was expert testimony and its weight depended upon the qualifications of the expert, and it is well settled that an expert may be subjected to fairly exhaustive cross-examination upon subjects which legitimately throw light on his qualifications, such as his education, the extent of his experience in practical application of his art or science, the extent of his observation outside of his own work, as well as other cognate matters bearing directly on his ability as an expert.

It was doubtless in reliance upon this principle that the defendants' attorney upon cross-examination asked the witness questions concerning the supposed weakness in the construction of the fire flue, and particularly whether it was of unusual length, whether he ever saw a single-sheet fire flue of that length before, whether he considered it weak in construction, and if so how he would have constructed it in order to make it of greater strength.

All this seems to us to have been clearly legitimate cross-examination and not to have been examination upon a new subject, thus opening the door to an inquiry as to a new ground of liability not covered by the pleadings.   Nevertheless, when plaintiffs' counsel took the witness upon redirect examination, counsel for the plaintiff proceeded to ask the witness whether such fire flues were in general use and how long since they had been in general use, for the purpose of showing that the type had been obsolete for thirty years. Upon objection to this testimony the court ruled that by his cross-examination the defendants' counsel had opened the door to testimony upon the general subject of the safe construction of such flues, and the witness was allowed to answer the questions and did answer them in effect as desired by the plaintiffs.

Thus the question of defective original construction of the fire flue was allowed to be brought into the case, and thereafter, as we have seen, the question was submitted to the jury, and the finding of the existence of such defect forms an inherent part of the ground of recovery in both actions which cannot be separated from the other grounds of liability found.

This court has gone as far as any court, we believe, in disregarding mere defects of form in pleadings and in endeavoring to administer justice even when technical requirements of pleading have not been followed, providing no substantial prejudice has resulted therefrom to the complaining party. *McHolm v. Philadelphia & R. C. & I. Co.* 147 Wis. 381, 132 N. W. 585. This is especially true where evidence has come in without objection. *Hemenway v. Beecher,* 139 Wis. 399, 121 N. W. 150; *Swanby v. Northern State Bank,* 150 Wis. 572, 137 N. W. 763. In the present case, however, there was timely and persistent objection to the introduction of any evidence concerning defects in original construction of the fire flue, as we have already seen. That objection was not waived by the cross-examination of the witness Cooley, and there is no room for holding that this question was ever tried by consent. It is very evident that the question of defects in original construction is a very important one. The defendants could not be expected to meet that question in a day or perhaps in weeks. Counsel would not be justified in going to trial on that issue without considerable investigation, necessitating certainly the testimony of experts and perhaps the taking of depositions in other states.

It seems apparent to us that the fundamental error which was committed by the court in allowing this new ground of liability to be litigated and submitted to the jury without amendment of the pleadings and without consent, either express or implied, must reverse the case. It must be considered to have affected the defendants' substantial rights, namely, the right to know what charge of negligence is made

against him in time to make due preparations to meet it. Although the testimony was taken and the objections and exceptions reserved in the *Brey Case* alone, we regard the stipulation by which that testimony was to be considered in the *Sellers Case* with the same force and effect as if repeated in the latter case, as preserving the objections and exceptions in the *Sellers Case*. Some other questions are raised, but as there must doubtless be amendment of the complaint and perhaps a considerable change in the issues presented, we do not feel obliged to discuss them now. For the reasons stated, there must be new trials in both cases.

*By the Court.*—Judgment reversed in each case, and action remanded for a new trial.

In the case of *Brey v. Forrestal and another* the following opinion was filed:

TIMLIN, J. (*dissenting*). I think the judgment in this case should have been affirmed. The case as decided seems to support a conclusion that if the boiler was defective from two causes, one of which was charged in the pleadings and the other not, and evidence properly admitted to establish the former defect but evidence erroneously admitted to establish the latter defect, a judgment based on a verdict finding defendants negligent in failing to warn plaintiff of any danger should be reversed. I do not think this is correct or in conformity with precedent. It is a very old rule, often acted upon by this court, that surplusage in a verdict, pleading, or other record does not annul or avoid that which is, aside from the surplusage, sufficient. This rule was applied even in the most technical stage of the common law, and it should not be departed from now when none but prejudicial errors are cause for reversals.